UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CENTRAL SECTION

| | |
|---|---|
| JOHN J. HALLORAN,<br>Plaintiff<br><br>V.<br><br>RJM CORPORATION and RICHARD J. MONRO,<br>Defendants | CIVIL ACTION NO.<br>**04-40110** |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

This is an action brought by the plaintiff, John J. Halloran, the former Vice President and General Manager of the defendant RJM Corporation ("RJM") to enforce contractual obligations of RJM to comply with its severance obligations, including payment of six months' severance, following his termination without cause on February 13, 2004. The plaintiff also asserts claims for violation of the Connecticut wage laws, Conn. Gen. Stat. §31-71 *et seq.* (the "Connecticut Wage Statute") and intentional interference by the president and chief executive officer with his contractual relationship with RJM.

The plaintiff is seeking an injunction enjoining RJM Corporation and Richard J. Monro from selling, conveying, transferring, alienating, encumbering, or pledging the stock or assets of RJM, including but not limited to its intellectual property rights in the Beaumont Technology other than in the ordinary course of business. The plaintiff requests that this injunction continue until either a final judgment is entered and fully paid, or until such time as the defendant, RJM,

sets aside funds in a separate escrow account satisfactory to the plaintiff in the amount of $300,000. The plaintiff's preliminary injunction request is supported by the Complaint, and the Affidavit of John J. Halloran. This Memorandum is in further support of that request for an injunction.

## STATEMENT OF FACTS[1]

The plaintiff has had a long career as an executive in the New England area. From 1996 to 2001, he was President and Chief Executive Officer of DB Riley Consolidated, Inc. in Worcester, Massachusetts. In early 2001, the plaintiff was recruited by Richard J. Monro, President of RJM Corporation, to become the Vice President and General Manager of that company's Combustion and Environmental Group.

On or about April 11, 2001, the plaintiff and RJM Corporation entered into an Employment Agreement, a true copy of which is attached as Exhibit A to the Affidavit of Mr. Halloran (the "Agreement"). Under the terms of the Agreement, the plaintiff was employed as Vice President and General Manager of the Combustion and Environmental Group of RJM. This included a base salary of $240,000.00 per year as well as the ability to increase that income through annual performance reviews and a bonus plan based upon the profitability of the company.

The Agreement also included a severance package in the event that Mr. Halloran was terminated without cause. The severance provision of the Agreement provided as follows:

> **Termination by RJM Without Cause**. If RJM terminates your employment without "cause" (as defined below), within five (5) years of the date you commence employment with RJM, RJM's sole obligation will be to provide you with salary through your termination date, plus unused vacation pay in accordance with RJM's policies, *a severance payment equal to six (6) months base salary to be paid in equal installments in*

---

[1] The facts set forth herein are drawn from the Affidavit of John J. Halloran and the documents attached to and authenticated by that pleading.

*accordance with RJM's normal payroll practices commencing with your termination date* and medical coverage at the same rate as for active employees for the six (6) month period. You shall not be entitled to any unearned performance bonus or other compensation. (emphasis added)

The plaintiff commenced employment with RJM on or about April 16, 2001. During the course of his employment, he worked very hard on behalf of the company. The Combustion and Environmental Group was very successful and profitable under his leadership. The plaintiff fully and completely performed his obligations under the Agreement.

Not long after the plaintiff's employment began, RJM informed him that portions of his salary payments were going to be withheld to assist with the company's general financial condition. Mr. Monro promised that the amounts withheld would be paid at some point. In 2002 and the first half of 2003, 30% of the plaintiff's wages were withheld. In the second half of 2003, the wages withheld were decreased to 15% of his salary. During 2002 and 2003, the sum of $103,394.23 was withheld.

In early 2004, the plaintiff was informed that his wages in excess of the minimum wage were to be withheld. Until the date of his termination, the amount of wages withheld in 2004 totaled $21,208.23. Mr. Monro indicated that these amounts were withheld to assist the company due to its difficult financial circumstances. Mr. Monro repeatedly assured the plaintiff that RJM would make up those withheld amounts with interest.

On February 13, 2004, the plaintiff was informed that he was being terminated. He was told that his termination was due to the financial situation of the company. Upon being informed of this termination, the plaintiff inquired as to what would happen with respect to the monies that had been withheld, other monies due related to company expenses that he had paid, his vacation pay which had accrued, and the payments due under the severance provision of the Agreement.

Following demand by Mr. Halloran's counsel, RJM paid the sum of $111,682.43 (the amount of wages owed less an allowance for a company car, which was transferred to Mr. Halloran) as reflected in the accounting provided by RJM and which is attached to the Affidavit of John J. Halloran as Exhibit D. In that accounting, RJM refers to the payment of the withheld monies as a "retention bonus." Given that this is the exact amount of the difference between the plaintiff's base salary provided by the Agreement and the wage payments made during his employment, it is clear that this amount was not a "bonus."

In light of the "without cause" termination of his employment, the plaintiff was also entitled to severance pay for six months following the date of his termination pursuant to the severance provision of the Agreement. He was also entitled to the continuation of health insurance during that period. While RJM has maintained the plaintiff's health insurance, it has not made a single payment under the severance payment obligations. If this pattern continues and no payments are made during the entire six-month period, the plaintiff will be owed $120,000.00 by RJM.

On March 9, 2004, following the date that the first severance payment was due, the plaintiff made a written demand upon RJM to cure its default under the Agreement. See Affidavit of John J. Halloran at Exhibit E. There has been no response whatsoever to that demand. No severance payments have been made. RJM has no defense to the plaintiff's claim for severance.

Based on information and belief, the management of RJM is exploring a variety of alternatives, including the sale of the company, the sale of certain assets of the company, the issuance of additional stock in return for equity financing, or a straight restructuring or refinancing of its debt. If any of these events occur, the plaintiff's ability to collect any judgment

that he will receive is in jeopardy. Without injunctive relief, the plaintiff has no means by which to prevent RJM or Mr. Monro from transferring their assets, alienating their remaining capital and making themselves judgment proof. As a result of defendants' refusal to pay his severance, the plaintiff has filed this action and seeks the entry of a preliminary injunction to assure his legal remedy.

## ARGUMENT

### I. The Standard of Review.

"A party who seeks a preliminary injunction must show: (1) that he has a substantial likelihood of success on the merits (2) that he faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e., that the issuance of an injunction will not impose more of a burden on the nonmovant than its absence will impose on the movant); and (4) that the granting of prompt injunctive relief will promote (or, at least, not denigrate) the public interest." Nieves-Marquez v. Commonwealth Of Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003); McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996); Narragansett Ind. Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

### II. Substantial Likelihood Of Success On The Merits.

The first inquiry that the Court must undertake in an assessment of the plaintiff's claim for injunctive relief is the reasonable likelihood of success on the merits. For the purposes of this Motion, the plaintiff alleges that RJM breached its contract with him; and that it and Mr. Monro withheld his wages in violation of the Connecticut Wage Statute.

### A.  Breach of Contract.

"To recover damages in a breach of contract claim, the plaintiff must prove the existence of a valid binding agreement, the defendant's breach thereof, and damages resulting from the breach." Singarella v. Boston, 348 Mass. 387 (1961). The plaintiff's breach of contract claim is simple and straightforward and RJM has no defense. The parties had a contract which contained a severance provisions which would come into play if he was terminated without cause. Mr. Halloran performed all of his obligations under the contract. RJM terminated Mr. Halloran without cause. RJM was obligated to make severance payments beginning with the next payroll date. It did not do so and has failed to make a single severance payment in breach of its contract. Mr. Halloran has been damaged as a result of that breach. The facts (which the plaintiff believes are not in dispute) clearly show the plaintiff has a substantial likelihood of success on his breach of contract claim.

### B.  Violations of Connecticut Wage Statute.

####  1.  Withheld Wages During Employment.

Conn. Gen. Stat. § 31-71e provides: "No employer may withhold or divert any portion of an employee's wages unless (1) the employer is required or empowered to do so by state or federal law, or (2) the employer has written authorization from the employee for deductions on a form approved by the commissioner, or (3) the deductions are authorized by the employee, in writing, for medical, surgical or hospital care or service, without financial benefit to the employer and recorded in the employer's wage record book." Conn. Gen. Stat. § 31-71a (3) defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation . . . ." See Morales v. Pentec, Inc., 57 Conn. App. 419, 427 (Conn. App. 2000). As the pleadings and the

supporting documentation demonstrate, the defendants cannot dispute the fact that RJM withheld over $124,000.00 of the plaintiff's salary for the financial benefit of the Company over a three year period. RJM's payment to "catch up" after terminating the plaintiff does not erase its violation of this extremely important statute.

2. Withheld Severance Payments.

Connecticut has also defined wages to include severance payments. Selander v. Soundview Tech. Corp., 2003 Conn. Super. LEXIS 342, 5-6 (Conn. Super. 2003) (a copy of which is attached hereto). Subsection § 31-71a(3) defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission *or other basis of calculation*..." (Emphasis added.) This definition expressly leaves the determination of the wage to the employer-employee agreement. Mytych v. May Dept. Stores Co., 260 Conn. 152, 163 (2002). There is no settled doctrine regarding the time at which an employee's rights to his wages vest, and the timing of that accrual is left to the determination of the wage agreement between the employer and employee. Id. at 164-65.

In the case at bar, the terms of the parties' Agreement determined his wage and when it would accrue. The parties determined that if Mr. Halloran was terminated without cause, he would continue receiving salary and benefits for six months. He was terminated without cause and, therefore, is entitled to these wages pursuant the Agreement. The defendants have refused to pay him. The employment contract is controlling in determining whether a party has violated §31-72. See Mytych v. May Dept. Stores Co., 260 Conn. at 163-65. Accordingly, the plaintiff has shown a substantial likelihood of success against the defendants for violations of §31-71 et. seq. See also, Selander v. Soundview Tech. Corp., 2003 Conn. Super. LEXIS 342 (Conn.

Super. 2003) (finding a failure to pay severance payments pursuant to an employee agreement sufficient to allege a cause of action under Gen. Stat. § 31-72).

### 3. Double Damages and Attorneys Fees.

Conn. Gen. Stat. § 31-72 provides in relevant part: "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive... such employee...may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court..." See also, Mytych v. May Dep't Stores Co., 260 Conn. 152, 162 (Conn. 2002). Doubling damages for unpaid wages is in keeping with "the remedial purpose of the wage laws." Petronella v. Venture Partners, Ltd., 60 Conn. App. 205, 215, cert. granted, 255 Conn. 909 (2000). See also, Anderson v. Schieffer, 35 Conn. App. 31, 42 (Conn. App. 1994). Where the amount of compensation due the plaintiff is readily "liquidated by application of simple arithmetic" and there is "no justification for withholding," double damages may be awarded pursuant to § 31-72. Anderson v. Schieffer, 35 Conn. App. 31, 42-43 (Conn. App. 1994). See Sansone v. Clifford, 219 Conn. 217, 229, 592 A.2d 931 (1991) (awards for double damages are "inappropriate in the absence of the trial court's finding of bad faith, arbitrariness or unreasonableness...")

Here, the plaintiff has clearly shown that there was absolutely no justification for withholding Mr. Halloran's wages during his employment or his severance wages after termination. His wages were easily determined by the Agreement and simple math. As such, defendants' actions justify an award of double damages as arbitrary and unreasonable. Therefore, the plaintiff has shown a substantial likelihood of success on the merits of his claim for double damages and attorneys fees for violation of Connecticut's Wage Statute §31-72.

### III. The Substantial Threat That The Plaintiff Will Suffer Irreparable Injury If The Injunction Is Not Granted Outweighs Any Harm That Defendants Will Suffer By Maintaining The Status Quo.

It is likely that the plaintiff will suffer irreparable harm if the defendants are not enjoined from disposing of and transferring their interests in or the assets of RJM, including but not limited to its intellectual property rights in the Beaumont technology, other than in the ordinary course of business. Irreparable harm is proven where a preliminary injunction restraining the transfer of assets is necessary to assure the presence of an adequate damages remedy. Unisys Corp. v. Dataware Products, Inc., 848 F.2d 311, 314 (1st Cir. 1988) citing Teradyne, Inc. v. Mostek Corp., 797 F.2d 43 (1st Cir. 1986).

The defendants may argue that preliminary injunctive relief restraining the transfer of assets may not be granted in cases where monetary damages are available except in extraordinary circumstances. However, injunctive relief restraining the transfer of assets can be granted when the district court finds that the defendant may be insolvent before a final judgment is entered. Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 52 (1st Cir. 1986). The Supreme Court has held that a preliminary injunction, designed to freeze the status quo and protect the damages remedy is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment. Id. citing Deckert v. Independence Shares Corporation, 311 U.S. 282, (1940).

The facts of Teradyne, Inc. v. Mostek Corp., 79 F.2d 43 (1st Cir. 1986) are analagous to the present case. In Teradyne, the plaintiff/seller, filed an action against the defendant/buyer for breach of contract. The defendant had agreed to purchase Teradyne's laser systems for use in their manufacturing operations. The defendant then cancelled the order it had given to Teradyne and then cancelled a second order two months later. Id. at 45. Teradyne demanded cancellation charges in accordance with the sales agreement. The defendant refused to pay. Teradyne initiated arbitration proceedings. After initiation of arbitration, defendant announced that it

would cease operations. A third party agreed to purchase all of defendant's assets for approximately $71 million dollars. The sale occurred and defendant's creditors were notified. Id. The proceeds of the sale were deposited into a separate account for the payment of defendant's creditors. Prompted by this action, Teradyne commenced an action seeking an injunction requiring defendant to set aside sufficient funds to satisfy a judgment pending the outcome of arbitration. Id.

The First Circuit affirmed the District Court's holding that "[the defendant's] freedom to dispose of its assets created a substantial risk of irreparable harm to Teradyne, given that [defendant] was in the process of winding down after selling the bulk of its assets, that it failed to provide adequate assurances to alleviate Teradyne's concerns and that it could at any time make itself judgment proof." Id. at 52. The First Circuit also found that the affidavits showed a likelihood that Teradyne would succeed on its contractual claims, and that the balance of hardships was in Teradyne's favor. Id. Finally, the First Circuit found that injunctive relief restraining the transfer of assets can be granted when the court finds that the defendant may be insolvent before a final judgment is entered. Id. at 53.

Similarly, in this case, during the time that the plaintiff was employed at RJM, the company was in serious financial trouble. This is evident from the fact that the plaintiff's wages were withheld so that the company could make ends meet.[2] Furthermore, RJM and its stockholders continue to actively pursue the sale of the company and its assets, seek additional equity financing or undertake further borrowing or debt restructuring. This creates a substantial risk of irreparable harm to the plaintiff.

---

[2] It is very telling that RJM was paying its Vice President and General Manager minimum wage just prior to laying him off.

Several other circuit courts have also recognized the propriety of injunctive relief in such circumstances. See Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir. 1984) (the requirement that a plaintiff seeking a preliminary injunction show that an award of damages will be inadequate does not require a showing that damages will be wholly ineffectual, it is sufficient if damages will for some reason be seriously deficient as a remedy for the harm suffered, for example, because the defendant may become insolvent before a final judgment can be entered and collected); Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980) (even where plaintiff's remedy is limited to damages an injunction may issue to protect that remedy); Foltz v. U.S. News & World Report, 760 F.2d 1300, 1309 (D.C. Cir. 1985) (a preliminary injunction enjoining distribution of cash from an employee profit-sharing plan, designed to freeze the status quo prior to a determination of liability and the extent of any damages, is not improper).

The threatened injury to the plaintiff of being unable to recover upon his judgment outweighs any threatened harm the injunction may do to the defendants. Where serious issues are before the court, it is considered a sound idea to maintain the status quo *ante litem* provided that can be done without imposing too excessive an interim burden on the defendant. Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mgh. Co., Inc., 550 F.2d 189 (4th Cir. 1977). The relief requested merely prevents the defendants from any extraordinary alienation of their assets. They will maintain their current positions and can continue to attempt to operate their business. As such, no harm will result to the defendants from maintaining the status quo. Similarly, maintaining the status quo will not disserve any public interest.

## CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, the plaintiff has shown a reasonable likelihood of success on the merits of its claims for breach of contract, and violations of the Connecticut Wage Statute. The plaintiff has also shown that he will suffer irreparable harm in the absence of the requested injunction, which outweighs the limited harm that will flow to the defendants if it is granted. Accordingly, a preliminary injunction should be entered as follows:

"The defendants, RJM Corporation and Richard J. Monro, are enjoined from selling, conveying, transferring, alienating, encumbering, or pledging the stuck or assets of RJM Corporation, including, but not limited to its intellectual property rights in the Beaumont Technology, other than in the ordinary course of business. This injunction shall continue until either a final judgment is entered and fully paid, or until such time as the defendant, RJM, sets aside funds in a separate escrow account satisfying to the plaintiff in the amount of $300,000."

Respectfully submitted,

JOHN J. HALLORAN

By his attorney,

_Kristina N. Allaire_
Richard C. Van Nostrand, Esq.
BBO #507900
Kristina H. Allaire, Esq.
BBO #646001
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:   (508) 791-8502

Dated: June 14, 2004